UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
JASON RUBEN,

                              Plaintiff,

                 -against-

CITY OF NEW YORK,

                              Defendant.
-----------------------------------------------------------------------X

**VERIFIED COMPLAINT**

Civil Action No. 1:21-cv-05047

      Plaintiff JASON RUBEN ("Ruben"), by and through his attorneys, LEVY RATNER, P.C., alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, as to which allegations he believes substantial evidentiary support will exist after a reasonable opportunity for discovery, as follows against the CITY OF NEW YORK ("City" or "Defendant").

**INTRODUCTION**

      1.    Plaintiff brings this lawsuit to remedy the City of New York's discrimination against Black probationary firefighters in the FDNY Fire Academy, which resulted in his dismissal from the Fire Academy ("Academy") and cost him the opportunity to serve the City as a firefighter.

      2.    Black probationary firefighters are significantly less likely than white probationary firefighters to graduate from the Academy.  The cause of this disparity is the Academy's grading practices, which are facially-neutral but have an adverse impact against Black candidates and are not job related or consistent with business necessity.  Under this grading scheme, higher grades are awarded to those who succeed at a task on their first attempt. This practice gives a grading advantage to those who arrive at the Fire Academy with pre-

existing knowledge and skills related to the fire service.  As a result of the FDNY's lengthy and well-documented history of discrimination against Black applicants, white probationary firefighters are far more likely to have friends and family members serving in the FDNY and to arrive at the Academy with some familiarity with, or even mastery of, the information and skills that will be taught.

3.      The speed with which a probationary firefighter masters any particular skill is not a valid or job-related basis for determining his or her ability to do the job.  Rather, so long as mastery is attained within the course of the training program, the probationary firefighter has demonstrated the acquisition of the skills needed for the work.  The Academy's punitive grading practice is unique among New York City's uniformed agencies.  The Academies for Police officers and Correction officers permit retesting, so that trainees can demonstrate mastery of the material and graduate the Academy, even if they did not learn the skill on their first attempt.

4.      As a result of Defendant's discriminatory practice, Mr. Ruben has lost a career as a firefighter, resulting in years of lost pay and benefits, lost future earnings potential, emotional harm and other compensable damages.

5.      Mr. Ruben brings these claims of race discrimination pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") as amended, 42 U.S.C. §§ 2000e, *et seq.*; the New York State Human Rights Law ("NYSHRL"), New York Executive Law §§290 and 296; and the New York City Human Rights Law ("NYCHRL"), New York City Administrative Code §§8-101, *et seq.*  This action seeks declaratory, equitable and injunctive relief.  It seeks reinstatement of the Plaintiff as a firefighter with full retroactive seniority and pension benefits, back pay and front pay.  It seeks compensatory and punitive damages.  It seeks injunctive relief to secure future

protection and to redress the deprivation of Plaintiff's rights under these federal, state and local laws.

## JURISDICTION AND VENUE

6.      The jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3), 28 U.S.C. §§1331 and 1343(a)(3)-(4) and 28 U.S.C §1367(a) for claims arising under the NYSHRL and NYCHRL, based on supplemental jurisdiction over claims that arise from a common nucleus of operative facts and are so intertwined with other matters pending before the Court as to make exercise of supplemental jurisdiction appropriate.

7.      Pursuant to 28 U.S.C. §1391(b), venue is proper in the United State District Court for the Southern District of New York ("SDNY") because most of the events giving rise to the claims occurred within this District, and the SDNY has jurisdiction over cases against the City of New York.

8.      Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under Title VII.  This action is founded on a charge filed with the New York City Commission on Human Rights ("NYCCHR") that was cross-filed with the U.S. Equal Employment Opportunity Commission ("EEOC") (Charge No. 16F-2018-00123).  The lawsuit is commenced within ninety (90) days of Plaintiff's receipt of a notice from the EEOC of his right to sue.  A copy of the notice is annexed hereto as Exhibit "A."

## JURY DEMAND

9.      Plaintiff demands a trial by jury on all issues properly triable thereby.

## PARTIES

10.      Plaintiff is a Black man who, at all relevant times, was a resident of the State of New York.  He currently resides in Texas.

11.     Defendant City of New York ("City") is a municipal corporation duly organized and existing under the laws of the State of New York.  Defendant is an employer as defined by Title VII, the NYSHRL and the NYCHRL.

12.     Defendant maintains the Fire Department of the City of New York ("FDNY") and employs firefighters who, among other things, are responsible for protecting life and property in the City of New York.

## FACTUAL ALLEGATIONS

13.     Mr. Ruben took and passed an open competitive civil service examination for an entry-level firefighter position, and on June 12, 2017, he was sworn in to the FDNY Academy.

14.     After completing all but the final week of the 18-week Academy, and despite having an overall passing grade point average, Mr. Ruben was forced to resign or face termination.

### Grading at the Academy

15.     Grades at the Academy are based on performance in three areas:

A.      *Functional Skills Training 1 & 2:* Known as the FST, this component of the Academy is a two-part timed course that is completed on two separate occasions.

B.      *Academics:* This component consists of quizzes, a midterm exam, and a final exam.

C.      *Hands On* or *Practical Skills Training:* This component consists of a series of "evolutions" (or physical drills) in areas such as ladder operations, engine operations, self-contained breathing apparatus, and portable ladder operations.

4

16.     To graduate from the Academy, probationary firefighters must:

    A.     Attain an overall grade point average of 75 or above;

    B.     Pass both Functional Skills Training 1 & 2;

    C.     Pass either Hands On or Academics with a grade of 75 or higher; and

    D.     Demonstrate an aerobic fitness level of twelve (12) Metabolic Equivalent

        Tasks (METs), which is ordinarily done by passing a final run.

17.     According to the Probationary Handbook, Academics accounts for 50% of the overall average grade, Functional Skills Training accounts for 20% of the overall average grade, and Hands On/Practical Skills Training accounts for 30% of the overall average grade.

18.     Mr. Ruben obtained an overall grade point average of 76.45, but he was forced to resign from the Academy in lieu of termination because he did not pass either Hands On or Academics with a 75 or higher.

**The Academics Component**

19.     The Academics portion of the Academy grade is intended to test for mastery of the information contained in the Probationary Handbook.

20.     At 50% of the overall grade, Academics scores are the most heavily-weighted factor in determining the final Academy score.

21.     The Academics grade is comprised of 12 quizzes (weighted equally) a midterm exam (weighted as three quizzes), and a final exam (weighted as five quizzes).

22.     Failing scores at the start of Academy training are retained and continue to be averaged into an overall Academics score, even where subsequent results demonstrate that the probationary firefighter has mastered the material.  This grading practice was one cause of Mr. Ruben's dismissal from the Fire Academy.  This practice is also inconsistent with both legal

standards and professional testing standards and unduly benefits those with prior firefighter experience or job knowledge.

23.     During Mr. Ruben's time in the Academy, it was not clear how his Academics grade would be calculated.  Mr. Ruben was told by drill instructors that they did not know how many quizzes the Final would be worth.  He was told that they did not know if the lowest quiz score would be dropped from the overall average.  Mr. Ruben understood from these answers that the worst quiz score was sometimes dropped and that the value of the Final exam could vary from one Academy class to another.

24.     During the first half of the Academy, while Mr. Ruben was being exposed to new and unfamiliar material and terminology, he scored a 35 on one single quiz. Over the course of his Academy tenure, Mr. Ruben's Academics grades steadily improved, which demonstrates that, according to the FDNY's measurement tools, Mr. Ruben was successfully learning the material that had been difficult for him in the earlier weeks of the Academy.  By the time Mr. Ruben completed the Academy, he achieved an 80 on the final exam, which is a cumulative test of all the material covered in the Academy.  Yet the 35 was retained and factored into Mr. Ruben's overall Academics average.  Had his lowest score been omitted from Mr. Ruben's final average, he would have scored above 75 in Academics and would have graduated from the Academy.

25.     For the first portion of the Academy, quizzes were given, graded, and never reviewed.  Although the material tested was cumulative, it was not until they began offering remedial classes on the weekends that the Academy offered probationary firefighters the opportunity to review their quizzes, identify their mistakes, ask questions, and focus their studying accordingly.  This was particularly important because the quizzes, midterm and final

repeated some of the same questions.  Yet the Academy never made Mr. Ruben's earliest quizzes available to him for review.  He never had the opportunity to look over the quiz he scored a 35 on because at that time there were no remedial sessions offered and therefore no review of the quiz.  Although Mr. Ruben asked to review that quiz, he was rebuffed and told it was not allowed.  This experience was unsettling to Mr. Ruben because in all his prior academic pursuits, teachers had routinely reviewed quizzes and tests with the class to ensure students could understand and correct their mistakes.

26.     The City has not professionally validated the quizzes, midterm exams or final exams that it uses.  The tests and quizzes are designed with tricks, double negatives and confusing language.  Nor has the City validated the cutoff scores used for individual tests and quizzes or for the Academics component of the Academy as a whole.

27.     The City's testing and grading practices with respect to the Academics component of the Academy have an adverse impact upon Black probationary firefighters.  The City's testing and grading practices with respect to the Academics component of the Academy are not job related and are not consistent with business necessity.  Alternatives with equal or greater validity and less impact are available.

28.     The Academics scores of Black probationary firefighters are significantly lower than the scores of whites.

29.     Information made available to Mr. Ruben by the City Commission on Human Rights revealed that Black probationary firefighters in Mr. Ruben's Academy class were more than four times more likely to fail or have no score reported as compared to white probationary firefighters.  A one-sided Fisher's Exact Test has a p value of .000 which reflects a statistically-significant difference in scores between Black and white probationary firefighters.

30.     Based on information provided by the City Commission on Human Rights, of those probationary firefighters who had an Academics average grade calculated, there was an average difference of 5.24 points between Black and white probationary firefighters that was statistically significant using a One-Way ANOVA test.

31.     According to the FDNY, Mr. Ruben failed the Academics component by less than two points.  For Mr. Ruben, these two points made the difference between a passing Academics score and a failing score, and the difference between graduating the Academy and being dismissed.

32.     White candidates are more likely to have a friends and family network within the FDNY.  They are more likely to have prior knowledge of and familiarity with firefighting terminology and techniques.  Far fewer Black firefighters have that advantage going into the FDNY Academy because of the City's history of racial exclusion from the FDNY.  In the second Vulcan Society lawsuit, the Court found that "[o]ther candidates receive guidance from family members or friends that work for the [Fire] Department while the 'minority' candidates very often do not know anyone that could provide guidance in this regard." *U.S., et al. v. The City of New York*, *et al.*, E.D.N.Y. Civ. Action No. 07-civ-2067 (NGG) (RLM), Mem. Findings of Fact 10, ECF No. 741.

33.     Mr. Ruben's outsider status was underscored by the FDNY's decision to physically separate a group of probationary firefighters that was almost entirely Black.  This group, which was struggling academically and was at risk of not graduating, was segregated from their peers and directed to sit for a number of quizzes and the midterm exam on the balcony of the auditorium, while the overwhelmingly white probationary firefighters remained on the main floor.

34.     The way Mr. Ruben's drill instructors chose to single out the overwhelmingly Black probationary firefighters to go to the balcony was especially humiliating.  The drill instructors waited for all of the probationary firefighters to file into the auditorium and take their seats before calling out the names of those who had to take the test on the balcony.  Each time this happened, Mr. Ruben had to get up from wherever he was seated and squeeze past his classmates to reach the aisle.  Anticipating the experience of being singled out, and hearing his peers laugh and snigger at him as he moved to the aisle, made him dread the days when he would have to take a quiz.

35.     Mr. Ruben was discouraged and humiliated by the way he was racially segregated and required to take his tests in a separate space.  The segregation was done in such a way as to draw maximum attention to those singled out and make it as humiliating as possible.  Probationary firefighters laughed when the names were called of those required to go to the balcony for testing.  Drill instructors administering the tests made belittling remarks to those who were separated, calling them "dummies," joking about their intelligence, for example, telling those in the balcony that their crayons and coloring books would be sent up shortly when handing out the quizzes to those remaining in the main auditorium, and suggesting they were too stupid to take the tests.  The drill instructors allowed those other probationary firefighters remaining in the auditorium to laugh at those in the balcony.  Being singled out, having his intelligence questioned, and being made the brunt of jokes affected Mr. Ruben's confidence and his test scores.

36.     This practice likely had a negative impact on the scores of Black firefighters taking their quizzes and tests on the balcony.  Social science evidence suggests that the decision to segregate the firefighters of color who were already struggling academically likely harmed

9

their Academics performance.  By emphasizing Black firefighters' lower test scores, in a context that drew attention to their racial group, the FDNY created an environment that could be expected to trigger stereotype threat.  This could be expected to further depress test scores.  *See, e.g.*, Claude M. Steele & Joshua Aronson, *Stereotype Threat and the Intellectual Test Performance of African Americans*, 69 (5) J. OF PERSONALITY & SOC. PSYCH. 797, 797–811 (1995).

37.    For Mr. Ruben, being singled out as "stupid" on his Academics made him nervous and self-conscious when attempting the Hands On evolutions at the Academy.  It put added pressure on him to succeed because he wanted to show his Squad that he was not stupid and demonstrate his competence and worth.  This in turn made the Hands On evolutions more stressful for Mr. Ruben.

38.    Mr. Ruben was directly harmed by the adverse impact in the grading of Academics performance, the unvalidated tests and cutoff score used by the FDNY and the way he was singled out for ridicule.

## The Hands On Component

39.    The grading of Hands On skills harms those who do not perform new tasks correctly the first time.  Mr. Ruben was harmed by this grading system.

40.    The Hands On component of the Academy is intended to test one's ability to perform various physical tasks, which are called "evolutions."  For example, Hands On tests probationary firefighters' ability to tie certain knots, perform searches, stretch hose lines, use their equipment, and put out fires.

41.     The Hands On scoring methodology gives lower scores to probationary firefighters who master a skill only with practice.  For example, a firefighter who requires two attempts to demonstrate mastery of an evolution would receive a failing score:

# of satisfactory PST evolutions             in this example: 1/2 = 50%
        # of PST attempts

42.     According to materials the Fire Department provided to the City Commission, it appears that, although Mr. Ruben mastered the critical skill of "Single Slide," his mastery required five attempts.  Thus, despite successfully completing this critical and multi-part skill, his overall grade for this evolution would be 20% (one successful attempt out of five attempts). The Academy scoring meant that Mr. Ruben's mastery was averaged into his score as a failure.

43.     Mr. Ruben did not understand the impact of the FDNY's grading scheme while he was at the Academy.  His instructors had told him not to worry about early unsuccessful attempts, explaining that he would be able to perform the skills by the end of the Academy.  He did not understand that his attempts to learn the skill would be held against him even when he ultimately gained mastery.

44.     This grading practice privileges those with prior connections to the fire service, who have had access and opportunity to learn the skills before joining the Academy.  This advantages white firefighters, who are more likely to have prior knowledge of firefighting terminology and techniques because of family and friends in the fire service.

45.     This grading scheme is not only punitive, it is also unusual.  The FDNY's approach is out of line with the concept of "Mastery Criterion," which would ordinarily be used at a training academy like the Fire Academy.  A grading scheme in line with industry standard would measure the number or percent of evolutions that were ultimately satisfactorily completed

11

against the total number of evolutions that firefighters are required to master.  The grading scheme used in the Academy is not consistent with best practices in professional testing.

46.     The grading procedures used for Hands On have not been professionally validated, are not job related, and are not consistent with business necessity.

47.     The City knew about and ignored the harmful impact its grading scheme would have on Mr. Ruben.  In its response to the City Commission, the City explained that "[a]lthough Complainant received the vast majority of his unsatisfactory ratings in his first month at the PFS [Probationary Fire School], his unsatisfactory scores were calculated into the final average, regardless of his improvement."  Position Statement at 6-7.

48.     Based on information provided by the City Commission on Human Rights, among those probationary firefighters who had a Hands On score calculated (N=213), there was an average difference of 2.00 points between Black and white probationary firefighters; whites did better.

49.     For Mr. Ruben, watching his Academy instructor demonstrate how to complete a drill was often his first experience ever seeing the skill demonstrated in person.  The first time Mr. Ruben was able to attempt a particular evolution and receive individualized feedback on his effort was, more often than not, a graded attempt.  Only rarely was he allowed to practice before being graded.

50.     Mr. Ruben saw how the children or other family members of current or retired firefighters got to practice for years before they entered the Academy.  He saw the children of white instructors – who were not members of the Academy – attend weekend remedial Hands On sessions where their parents set up parallel equipment for their children to practice on and simultaneously instructed both their children and the probationary firefighters in the evolution.

This advance preparation would mean that those children would succeed in the Academy in future years.   Unlike these children, Mr. Ruben was graded on his first-ever attempt at an evolution.

51.     An essential feature of exam validity is reliability, which means that similar performances would be graded in a consistent fashion across graders and test takers.  The Fire Department does not ensure consistency between graders or check that none of the graders are producing outlier results.  Thus, while all graders assess the same skills, there is no evidence that graders evaluate the skills using uniform standards.  One instructor may fail an attempt that another instructor would pass.  Knowing this, probationary firefighters attempted to be graded by instructors they understood to be more likely to award a passing grade.

52.     Mr. Ruben was harmed by the Hands On grading scheme, which has an adverse impact on Black firefighters, is not valid, and is used by the City despite alternatives that would have less impact and offer equal or greater validity.  This was a cause of his dismissal from the Fire Academy.

### Remedial Training at the Academy

53.     The City offers remedial classes to those at risk of failing the Academics or Hands On components of the Academy, but it did not offer them until the first quarter of the Academy was over and after poor initial grades had already put Mr. Ruben at risk of failing the Academy.

54.     The remedial classes for both Academics and Hands On were offered on the same day at overlapping times.  Oversubscription limited Mr. Ruben's ability to complete the Hands On practice that he needed.  In particular, Mr. Ruben and many others needed practice on the Single Slide evolution.  Mr. Ruben was only occasionally able to practice this critical evolution because it had a longer line, and even though the weekend remedial sessions were voluntary,

13

Academy rules requiring promptness still applied.  Mr. Ruben did not want to risk punishment for lateness, so he made sure to practice only those evolutions with shorter lines that would enable him to get to the Academics remedial on time.

55.    Mr. Ruben regularly attended both Academics and Hands On remedial classes on Saturdays.  He also stayed late during the week to attend additional Hands On remedial classes when they were offered.

56.    From Mr. Ruben's observation, the probationary firefighters attending the remedial sessions were disproportionately Black.

57.    Upon information and belief, the Fire Academy has used remedial class attendance as a grade enhancer to allow probationary firefighters to graduate the Academy where their scores were just below the cutoff.  This benefit was not extended to Mr. Ruben, even though he attended remedial classes.

### Termination

58.    On October 12, 2017, six days before the Academy graduation day, and after his mother had traveled from out of state to attend his graduation, Mr. Ruben was told that he would either be dismissed from the Academy or could immediately resign in lieu of termination.  He was informed by Chief of Personnel Michael Massucci that if he did not resign his employment, he would be terminated for cause, and the termination would affect his ability to obtain other City employment.

59.    Mr. Ruben had already taken his final examination (receiving a passing score of 80), had passed both his FST 1 and 2, and had completed all but a single day of evolutions when he was forced to resign.  Of the material that was left to cover, Mr. Ruben had already completed and passed two of the three evolutions remaining.  Because he was forced to miss the day and

resign, he did not have the opportunity to participate in the Tower Ladder drill, which is only taught in the final days of the Academy.  This is the only evolution he missed.

60.     Mr. Ruben was directed to wait in the cafeteria at the Academy for ten hours with six other probationary firefighters, all of whom were Black, before they were sent to FDNY Headquarters where Mr. Ruben and, upon information and belief, the other Black firefighters, were told to resign or face immediate dismissal.

61.     Mr. Ruben's dismissal from the Academy was unexpected.  He spoke to members of the Academy staff to try to understand the way his grades had been calculated.  No one he spoke with could or would explain how he was graded or why his performance resulted in a failing Hands On grade.

62.     Black firefighters resign or are terminated from the Academy at higher rates than white firefighters, resulting in adverse impact against Black firefighters.

63.     In Mr. Ruben's case, the Academy's unvalidated grading practices resulted in lower overall grades than he should have received, but upon information and belief, Mr. Ruben actually met the requirements of the Academy and should have been permitted to graduate.

64.     The Department's unvalidated means of assessing probationary firefighters and the unvalidated cut scores relied upon to decide which probationary firefighters graduate from the Academy cost Mr. Ruben his dream job.

### History of Discrimination in the FDNY and Disparate Treatment of Mr. Ruben

65.     The FDNY has a long and established history of discrimination against Blacks.

66.     The Vulcan Society, the organization of Black firefighters within the FDNY, has successfully sued the City twice to ensure that the FDNY's hiring practices comport with Title VII's requirements.  In 1973, Judge Edward Weinfeld held that the City's firefighter hiring

practices were racially discriminatory and noted the "overwhelming disparity between minority representation in the [FDNY] (5%) and in the general population of New York City within the age group eligible for appointment (32%)." *The City of New York*, Mem. & Order 5, ECF No. 294, July 22, 2009 (citing *Vulcan Soc'y of N. Y. C. Fire Dep't. Inc. v. Civ. Serv. Comm'n*, 360 F. Supp. 1265, 1269 (S.D.N.Y. 1973)). Despite judicial intervention and public scrutiny from the New York City Public Advocate, the New York City Equal Employment Practices Commission, the New York City Council's Committee on Fire and Criminal Justice, and the news media, the FDNY has been slow to reform practices that create barriers to equal employment. Nearly thirty years after the Vulcan Society's first lawsuit, Judge Nicholas G. Garaufis found that Judge Weinfeld's observation remained relevant. The Court noted that the FDNY was unique among City agencies in its "monochromatic composition," comparing it with the significant progress that had been made by the New York City Police Department over the same period. *Id*.

67.     The Vulcan Society's lawsuits have begun to address the FDNY's history of discrimination, but the Department's culture of exclusion has not been eradicated. As changes to the selection process opened doors for candidates like Mr. Ruben to enter the Academy, doors closed later in the hiring process. The Academy came to be used as a gatekeeper.

68.     The Department would have treated Mr. Ruben differently and would have allowed him to graduate had it been known that he had a family member working on the job as a firefighter.

69.     When Lieutenant David Obiesie, the FDNY's Diversity Advocate, learned from Mr. Ruben that he had a cousin serving in the Department, Lt. Obiesie told Mr. Ruben, in sum and substance, "Why didn't you say McCallum was your cousin? If that had been known, this probably wouldn't have happened." Mr. Ruben understood from this comment that he would

16

have been permitted to graduate from the Academy if his connections within the Department had been known prior to his termination.

70.     Favoritism and nepotism play a significant role in the failure or success of probationary firefighters at the Academy.   Because of the Department's history of racial discrimination, and because Chiefs and Captains within the Department are overwhelmingly white, these practices are statistically-significantly more likely to benefit white probationary firefighters.

71.     Lacking known family ties and connections within the Department, Mr. Ruben was not a favored probationary firefighter.

72.     Mr. Ruben was graded more harshly in his Hands On performance than his white counterparts for equivalent performance.

73.     Because of this disparate treatment, Mr. Ruben's scores at the Academy were lower than they would otherwise have been.

74.     The treatment Mr. Ruben received at the Academy, and his resignation, caused him to suffer from anxiety, depression and loss of sleep.   He was humiliated and felt like a failure.   He avoided contact with friends and neighbors who might ask him about how his job was going.   He avoided leaving his home, lost his appetite, and stopped exercising.   His self-confidence and self-worth suffered.   His mother, who had come in from out of town for the Academy graduation, delayed her return home by weeks because she was so worried about him. Moreover, Mr. Ruben's faith in New York City was shattered.   He was concerned that his reputation had been irreparably damaged and that he would not be able to secure employment in New York City.   He relocated to Texas, at significant expense and with resultant harm to his earnings potential.

17

**AS AND FOR A FIRST CAUSE OF ACTION – RACE DISCRIMINATION**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.***

75.     Plaintiff realleges and incorporates by reference the allegations in all preceding paragraphs.

76.     Title VII makes it unlawful for an employer (1) to fail or refuse to hire or otherwise discriminate against any individual with respect to their terms, conditions, or privileges of employment because of race or color, or (2) to limit, segregate, or classify applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect their status as an employee because of race or color.  42 U.S.C. § 2000e-2(a).

77.     Throughout the relevant time period, Defendant's grading system at the Academy has had a disparate impact on Black probationary firefighters.  The use of the Academy grading system is neither job-related nor consistent with business necessity.  Defendant has failed to consider and refused to use alternative methods of grading that are equally or more valid and less discriminatory.

78.     Defendant knew, and in fact intended, that its actions would result in otherwise-qualified Black probationary firefighters being prevented from graduating the Academy and becoming New York City Firefighters.

79.     The foregoing conduct, as alleged, constitutes a violation of Title VII.

**AS AND FOR A SECOND CAUSE OF ACTION– RACE DISCRIMINATION**
**Violation of the New York State Human Rights Law,**
**New York Executive Law §§290, 296**

80.     Plaintiff realleges and incorporates by reference the allegations in all preceding paragraphs.

18

81.     New York State Human Rights Law, New York Executive Law §§290, 296 bars employment discrimination on the basis of race and color.

82.     The foregoing conduct, as alleged, constitutes a violation of New York State Human Rights Law, New York Executive Law §§290, 296.

## AS AND FOR A THIRD CAUSE OF ACTION – RACE DISCRIMINATION
### Violation of the New York City Human Rights Law,
### Admin. Code §8-107(1)

83.     Plaintiff realleges and incorporates by reference the allegations in all preceding paragraphs.

84.     New York City Human Rights Law prohibits employment discrimination on the basis of race and color.

85.     The foregoing conduct, as alleged, constitutes a violation of New York City Human Rights law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jason Ruben prays for relief as follows:

A.     Issue a declaration that Defendant violated Plaintiff's rights under federal, state and local laws as alleged herein;

B.     Grant injunctive relief reinstating Plaintiff to a position as a firefighter with retroactive seniority and pension benefits and enjoining Defendant from further discrimination or retaliation;

C.     Award equitable relief in the form of back pay and front pay;

D.     Award compensatory damages for the injuries Plaintiff suffered by reason of Defendant's unlawful conduct, including damages for the pain, suffering, emotional distress, loss of dignity, humiliation and damage to reputation and livelihood endured by Plaintiff in amounts

19

that are fair, just and reasonable, to be determined at trial;

      E.      Award Plaintiff punitive damages in an amount to be determined at trial;

      F.      Award Plaintiff all reasonable attorneys' fees and costs of this action and fees for

any work required to ensure compliance with any order of injunctive relief, as provided for in 42

U.S.C. §1988 and 42 U.S.C. §2000e-5(k); and

      G.      Grant such other and further relief as the Court determines to be just and proper.


Dated: June 8, 2021
      New York, New York

                      LEVY RATNER, P.C.

By:    Dana E. Lossia
       Rebekah Cook-Mack
       80 Eighth Avenue, 8th Floor
       New York, New York 10011
       Telephone: (212) 627-8100
       Fax: (212) 627-8182
       dlossia@levyratner.com
       rcookmack@levyratner.com

       *Attorneys for Plaintiff Jason Ruben*

**VERIFICATION**

STATE OF TEXAS   )
                ) ss.:
COUNTY OF *Tarrant* )

     I, JASON RUBEN, being duly sworn, state that I am the Plaintiff in the above-referenced litigation and have read the Verified Complaint and know the contents thereof and that the same are true to my own knowledge, except as to the matters alleged on information and belief, and as to such matters I believe them to be true.

_____
JASON RUBEN

Sworn to before me this
_03_ day of June, 2021

_____
NOTARY PUBLIC

ROLANDO CRUZ
Notary Public, State of Texas
Comm. Expires 09-18-2024
Notary ID 132684825

983-000-00001: 11187479_6.docx

21